UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

NILDA CRESPO,
    *Plaintiff*,

v.

COMMISSIONER OF SOCIAL SECURITY,
    *Defendant*.

No. 3:18-cv-00435 (JAM)

**RULING ON CROSS MOTIONS TO REVERSE AND AFFIRM DECISION OF THE COMMISSIONER OF SOCIAL SECURITY**

Plaintiff Nilda Crespo asserts that she is disabled and unable to work because of fibromyalgia. She has brought this action pursuant to 42 U.S.C. § 405(g), seeking review of the final decision of the Commissioner of Social Security, who denied her claim for social security disability insurance benefits. Crespo has filed a motion to reverse the decision of the Commissioner, Doc. #35, and the Commissioner has filed a motion to affirm his judgment, Doc. #31. For the reasons discussed below, I will deny Crespo's motion to reverse and grant the Commissioner's motion to affirm.

**BACKGROUND**

I refer to the transcripts provided by the Commissioner. *See* Doc. #21-1 through Doc. #21-11. Crespo filed an application for disability insurance benefits under Title II on December 12, 2013, alleging a disability that began on July 20, 2012. Doc. #21-8 at 6. Because her earnings record allowed for her to remain insured through September 30, 2013, she was required to show that she became disabled on or before that date. Doc. #21-3 at 28. Crespo's claim was initially denied on July 9, 2014, Doc. #21-6 at 12, and denied again upon reconsideration on November

1

25, 2014, *id.* at 28. She then timely filed a written request for a hearing by an administrative law judge (ALJ) on December 9, 2014. Doc. #21-7 at 15.

Crespo appeared with a non-attorney representative and testified at a hearing in New Haven before ALJ Eskunder Boyd on March 29, 2017. Doc. #21-3 at 43. Vocational expert Jean Spaulding testified by phone. *Ibid.* On May 2, 2017, the ALJ issued a decision concluding that Crespo was not disabled within the meaning of the Social Security Act. *Id.* at 28. The Appeals Council denied Crespo's request for review on October 27, 2017. *Id.* at 2. Crespo then filed this federal court action on March 14, 2018. Doc. #1.

To qualify as disabled, a claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months," and "the impairment must be 'of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 45 (2d Cir. 2015) (quoting 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A)). "[W]ork exists in the national economy when it exists in significant numbers either in the region where [claimant] live[s] or in several other regions of the country," and "when there is a significant number of jobs (in one or more occupations) having requirements which [claimant] [is] able to meet with his physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(a)-(b); *see also Kennedy v. Astrue*, 343 F. App'x 719, 722 (2d Cir. 2009).

The agency engages in the following five-step sequential evaluation process to determine whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019); *see also* 20 C.F.R. § 404.1520(a)(4)(i)-(v).

In applying this framework, if an ALJ finds a claimant to be disabled or not disabled at a particular step, he may make a decision without proceeding to the next step. *See* 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proving the case at Steps One through Four; the burden shifts at Step Five to the Commissioner to demonstrate that there is other work that the claimant can perform. *See McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

After proceeding through all five steps, the ALJ concluded that Crespo was not disabled within the meaning of the Social Security Act. At Step One, the ALJ determined that Crespo had not engaged in substantial gainful activity since July 20, 2012, the date of the alleged onset of her disability. Doc. #21-3 at 30.

At Step Two, the ALJ concluded that Crespo suffered from the following severe impairments through her date last insured: carpal tunnel syndrome, lumbar radiculopathy, fibromyalgia, depressive disorder, and anxiety disorder. *Ibid.*

At Step Three, the ALJ determined that Crespo did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Ibid.*

The ALJ then found that Crespo had a residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. § 404.1567(b), with the following limitations:

> [S]he may never climb ladders, ropes, or scaffolds but can occasionally climb stairs and ramps. She may occasionally balance, stoop, and crouch, but never kneel or crawl. She cannot perform any overhead reaching. She may frequently handle or finger. She can perform simple routine repetitive tasks and sustain concentration, persistence, and pace for two-hour segments. She has no problems interacting with others. She can stand/walk up to 4 hours total, and sit for up to 6 hours total. She requires a sit/stand option whereas [*sic*] she can sit for about 30 minutes, alternate to a standing position for about 2-3 minutes, and then resume sitting.

*Id.* at 32. At Step Four, the ALJ concluded that Crespo was unable to perform any past relevant work through the date last insured. *Id.* at 35.

At Step Five, weighing Crespo's age, education, work experience, and RFC, the ALJ concluded that Crespo had the RFC to perform a significant number of jobs in the national economy, such as cashier, price marker, and collator/operator. *Id.* at 36. In reaching this conclusion, the ALJ relied on the testimony of the vocational expert. *Ibid.*

The ALJ ultimately held that Crespo was not disabled within the meaning of the Social Security Act. *Id.* at 37.

## DISCUSSION

The Court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); *see also* 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (*per curiam*). Absent a legal error, the Court must uphold the Commissioner's decision if it is supported by substantial evidence, even if the Court might have

4

ruled differently had it considered the matter in the first instance. *See Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

Crespo makes four claims of error. First, Crespo claims that the ALJ did not adequately develop the administrative record by failing to secure various function-by-function assessments and medical source statements from Crespo's treating sources. Doc. #35-1 at 17. Second, Crespo claims that the ALJ's analyses at Step Two and Three were insufficient. *Id.* at 24. Third, Crespo claims that the ALJ inadequately evaluated her fibromyalgia, chronic pain, and combination of impairments. *Id.* at 28. Finally, Crespo claims that the ALJ's Step Five analysis is not supported by substantial evidence. *Id.* at 33. I address each claim in turn.

### *The ALJ's responsibility to develop the record*

Crespo claims the ALJ did not adequately develop the record in several ways. First, Crespo alleges that the ALJ failed to obtain any function-by-function assessments from treating clinicians, including APRNs Jose Latorre and Carmen Calder, rheumatologist Dr. Mirela Dumitrescu, MD, mental health care providers, and general practitioner Dr. Planell-Pabón, MD. Doc. #35-1 at 17-19. She also alleges the ALJ failed to obtain function-by-function assessments of her orthopedic, podiatric, and obesity conditions from treating clinicians. *Id.* at 17. Second, Crespo claims that apart from untranslated and/or largely illegible medical records from Dr. Planell-Pabón and Dr. J.R. Robles Irizarry, MD, her record does not contain any medical source statements from her treating clinicians. *Id.* at 18.[1] Third, she alleges that medical records from her first application for supplemental security income and disability insurance benefits in 2009 were not "'imported' into the current claim." *Id.* at 17-18. Finally, Crespo claims that the ALJ

---

[1] Crespo names Dr. Ubaldo Planell-Pabón in reference to the record in question, but it appears to have been signed by Dr. Yaralin Planell-Pabón operating out of the same office. Doc. #21-10 at 140. The ALJ also names Ubaldo instead of Yaralin in reference to the record. Doc. #21-3 at 35. Any error in naming the physician was immaterial.

5

failed to gather records of LCSW Alex Pino's treatment of Crespo. *Id.* at 19.[2] For the reasons discussed below, I do not agree that the ALJ failed to develop the record.

It is well established that "[t]he ALJ, unlike a judge in a trial, must [himself] affirmatively develop the record" in light of "the essentially non-adversarial nature of a benefits proceeding." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999). The ALJ has a duty "to investigate and develop the facts and develop the arguments both for and against the granting of benefits." *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011). But the duty to develop the record is not limitless. An ALJ has no duty to develop a history outside the relevant period unless there are "obvious gaps or inconsistencies" in the record. *See O'Connell v. Colvin*, 558 Fed. App'x 63, 64 (2d Cir. 2014) (citing *Rosa*, 168 F.3d at 79 n.5). For applications for disability insurance benefits, as here, the relevant period is the alleged disability onset date to the date last insured. *See* 20 C.F.R. §§ 404.1512(b)(1), 404.1512(b)(1)(ii).

That the ALJ did not obtain various function-by-function assessments and medical source statements was not legal error. The question is not whether the ALJ obtained such assessments or statements from any particular clinician or as to any particular condition, as Crespo contends. Rather, a medical source statement is not necessarily required to fully develop the record where "the record contains sufficient evidence from which an ALJ can assess the [claimant's] residual functional capacity." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013). Likewise, "remand is not necessary merely because an explicit function-by-function analysis was not performed." *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

Accordingly, the Second Circuit found that an ALJ was not obligated to further develop the record where it contained a partially relied-upon opinion from a consultative examiner and

---

[2] Crespo requested records from Alex Pena. Doc. #21-6 at 5, 19-20. But APRN Latorre refers to Alex Pino in his notes. Doc. #21-4 at 2, 5, 9. I take it that these are the same person.

the treatment notes from the claimant's doctors. *See Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013). So too the Second Circuit has declined to find error where an ALJ disregarded the treating physician's opinion—the only treating source opinion—and made an RFC determination based in part on the treating source's notes, which contained descriptions of the claimant's symptoms and contemporaneous medical assessments sufficient to assess claimant's ability to perform sustained gainful activity. *See Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8-9 (2d Cir. 2017).

Here, there was sufficient evidence in the record from which the ALJ could assess Crespo's RFC: 400 pages of medical records, including treating APRN and physician's notes; a consultative examiner's report; non-consultative examinations from the state agency; and Crespo's testimony. To the extent that Crespo's claims are contesting the RFC assessment itself, that argument goes to the substantiality of the evidence rather than the sufficiency of the record. *See Morris v. Berryhill*, 721 F. App'x 25, 28 (2d Cir. 2018) (applying the substantial evidence test to ALJ's decision after determining sufficiency of the record).

Crespo further contests the sufficiency of the record because the statements of treating physicians Dr. Planell-Pabón and Dr. Robles Irizarry were untranslated, and Dr. Plannel-Pabón's were largely illegible. Generally, it is the ALJ's responsibility to clarify or supplement the record where important information is illegible. *See Minnifield v. Berryhill*, 2018 WL 4380979, at *7 (D. Conn. 2018) (collecting cases). This Court has found that sparse and illegible records from "key sources" during the relevant period may provide grounds for remand. *See Annunziato v. Berryhill*, 2019 WL 156934, at *3 (D. Conn. 2019) (citing *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 345 (E.D.N.Y. 2010) (finding "very significant gaps" in the record given the "complete absence" of contemporaneous medical evidence from treating physicians)). But an

7

ALJ is under no obligation to fetch records that do not exist or are not significant. *See Morris*, 721 F. App'x at 28 (record sufficient where "no indication that [missing records] contain significant information" and "[i]t is not even clear that any records are actually missing.").

Here, the relevant period for establishing disability is from July 20, 2012 (the alleged disability onset date) through September 30, 2013 (the date last insured). Although treatment records from outside that period may be relevant to the extent that they shed light on the claimant's condition during the period, such treatment records have less probative value because it is uncertain whether a claimant's condition *before* or *after* the relevant time period reflects the claimant's condition *during* the relevant time period.

Legible parts from both physicians' statements make clear that they were made and mostly concerned Crespo's condition *outside* the relevant period. Crespo had not visited Dr. Robles Irizarry from October 2010 to February 2014, roughly two years before and five months after the relevant period, respectively. Doc. #21-10 at 154. Likewise, 22 of 25 responses in Dr. Plannel-Pabón's statement concerned Crespo's condition in 2014, which was after the relevant period. *Id.* at 138-40. The first and third responses are the only two that specifically reference the relevant period, namely an initial examination on November 26, 2012, and subsequent findings on December 11, 2012. *Id.* at 138. The record does not contain any medical records within those two dates. Rather, only one of 33 pages of Dr. Plannel-Pabón's records appears to be from the relevant period: a January 2013 progress note that is mostly illegible with a roughly ten-word assessment, two-word diagnosis, and similarly short prescription. Doc. #21-10 at 160.[3]

---

[3] The document either is from January 2013 and out of sequential order, or in sequential order and, given preceding and subsequent notes, from the period between October and December 2013. Doc. #21-10 at 159-61. Nonetheless, I consider the prospect that it originated from the relevant period.

8

It is not clear that records from Dr. Plannel-Pabón in November and December 2012 actually exist. The agency twice requested and received records from Dr. Plannel-Pabón, Doc. #21-6 at 4, 17-18, and the record contains treatment notes from December 2010 to July 2014, Doc. #21-10 at 157-89, the period in which any 2012 notes would be found. Crespo nowhere alleges that there actually are missing records from Dr. Plannel-Pabón. By Crespo's own account, Dr. Planell-Pabón began treating her on October 24, 2013—roughly one month after the end of the relevant period. Doc. #35-1 at 19 n.34. Though this recollection likely was error given the November and December 2012 references discussed above, it serves to illustrate that Crespo has never complained of missing records from Dr. Plannel-Pabón.

Even if there are records from 2012, Crespo has not said, and the record does not show, why they or the January 2013 note would be significant. *See Velazquez v. Berryhill*, 2019 WL 1915627, at *6 (D. Conn. 2019) (claimant did not meet her burden of demonstrating significance where record did not show unobtained APRN opinion would be more limiting than or credited by ALJ). In fact, the record shows otherwise. In Dr. Plannel-Pabón's roughly ten-word remark on Crespo's history in her 2014 statement, she appears to mention fibromyalgia, depression, and chronic obstructive pulmonary disease (COPD). Doc. #21-10 at 138. The ALJ listed fibromyalgia and depressive disorder as severe impairments, Doc. #21-3 at 30, and acknowledged Crespo's COPD symptoms, *id.* at 33. The January 2013 note appears to provide only a single diagnosis: pulmonary disease, which COPD covers. Neither Crespo nor the record indicate that the 2012 records are any different from the January 2013 one—nothing more than "routine check-up and progress notes." *Cf. Morris*, 721 Fed. App'x at 28. Without more from either Crespo or the record, I cannot find the record insufficient on these grounds.

Crespo also alleges that the ALJ erred in not "import[ing]" her medical records from her first application for benefits. But that claim was denied on July 19, 2012, Doc. #21-3 at 188, so any accompanying records precede the relevant period and are of diminished significance.

Finally, Crespo claims that the ALJ erred in not gathering records of LCSW Alex Pino's treatment of Crespo. Crespo informed the agency in January 2014 that her first visit to Pino was in June 2012, before the relevant period, and her last visit was sometime in 2013, possibly during the relevant period. Doc. #21-9 at 11. This is consistent with APRN Latorre's notes in July and September 2013 that Crespo "has been" seeing Pino for treatment. Doc. #21-4 at 2, 9. The agency requested evidence from Pino at the initial and reconsideration levels. Doc. #21-6 at 5, 20. In a letter to Crespo, the agency said that it received Pino's report on October 17, 2014. Doc. #21-7 at 12. But there are no medical records or opinions from Pino in the administrative record.

Again, Crespo has not indicated in her motion—or anywhere in the record—whether Pino actually *has* treatment notes from the relevant period. *Cf. Duprey v. Berryhill*, 2018 WL 1871451, at *10 (D. Conn. 2018). On the contrary, APRN Latorre noted in September 2013 that Crespo "missed [her] last [appointment]" with Pino. Doc. #21-4 at 2. Even if there were treatment notes from Pino, Crespo has not given any reason why they would have changed the ALJ's decision. LCSWs are not "acceptable medical sources" and so cannot be considered "treating sources" whose opinions are entitled to controlling weight. 20 C.F.R. §§ 404.1502(a); 404.1527(a)(2), (c).

In short, I conclude that the ALJ satisfied his obligation to develop the record in this case. Crespo has not shown the absence of meaningful records. To the extent that records are alleged to be missing, most of these records concern treatment outside the relevant time period and for which there is good reason to doubt their significance.

*The ALJ's Step Two and Three analyses*

Crespo claims that the ALJ erred at Step Two by failing to find that her alleged obesity, lower extremity dysfunction/pain, and cervical disc protrusions/stenosis were severe impairments. Doc. #35-1 at 24-25. Crespo also alleges that the ALJ erred at Step Three by not considering her impairments under paragraphs B and D of listing 14.09 in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 27-28. I reject both claims.

An ALJ does not commit reversible error where substantial evidence supports a finding that an impairment is non-severe. *See Meadors v. Astrue*, 370 F. App'x 179, 182 (2d Cir. 2010). Here, substantial evidence supports the ALJ's finding that Crespo's three alleged impairments were non-severe. An impairment is non-severe if "it does not significantly limit your physical . . . ability to do basic work activities," such as walking, standing, or sitting. 20 C.F.R. § 416.922. Apparently in error, Crespo cites to the results of an endoscopy to support her argument—something not obviously related to the alleged impairments. Doc. 35-1 at 24 (citing Doc. #21-4 at 104-06). Crespo's only other reference to the record is to results from MRIs of her lumbar spine taken in July and August 2013. Doc. #35-1 at 26 (citing Doc. #21-5 at 42, Doc. #21-10 at 189). Both showed severe stenosis at L4-5 but otherwise stable, mild, or unremarkable results. Even then, the question is not whether a condition is medically classified as "severe," but whether it meets the regulatory definition.

The ALJ noted "the lack of findings regarding reduced upper body strength" and evidence of "use of a walker or cane or other assistive device" during the relevant period. Doc. #21-3 at 34. Indeed, Crespo admitted at the hearing that she only started using a walker in 2015, and could lift 10 or 15 pounds in 2013. Doc. #21-3 at 52, 62.

Likewise, Crespo's obesity is little mentioned in the record, and when it is, it supports the ALJ's finding. APRN Latorre noted in February 2012 that Crespo appeared "[n]ormal – [o]bese, well [d]eveloped, well nourished, in no acute distress." Doc. #21-4 at 34. Another APRN, Luis Rojas, noted in May 2012 that she appeared "[i]n no acute distress ([o]bese)." Doc. #21-4 at 41. Crespo also testified at the hearing that she lost 40-50 pounds over the previous six months. Doc. #21-3 at 51. This too substantially supports a finding of non-severity. Crespo's allegation that the ALJ did not consider how obesity contributes to mental impairments like her depression is unfounded; he expressly listed anxiety and depressive disorders as severe impairments. Doc. #21-3 at 30.

As to lower extremity pain, emergency department physician Dr. Jeffrey R. Herman, MD, found in July 2012 that Crespo had "right lower extremity dull aching," but "[t]he severity of the symptoms is moderate." Doc. #21-5 at 8. In visits to APRN Latorre from January to September 2013, Crespo's reported pain level varied unpredictably from a minimum of 0 to a maximum of 7 out of 10. Doc. #21-4 at 4, 7, 11, 15, 19, 24, 28, 33. An ALJ may exercise discretion in weighing the credibility of a claimant's reports of pain in light of such evidence in the record. *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (*per curiam*). Again, the ALJ's finding of non-severity is supported by substantial evidence.

An ALJ also does not commit reversible error when he fails to explicitly discuss a listing, so long as his "general conclusion" is supported by substantial evidence. *See Solis v. Berryhill*, 692 F. App'x 46, 48 (2d Cir. 2017). Here too, substantial evidence supports the ALJ's express determination that Crespo's impairments did not meet the criteria under listing 14.09. Doc. #21-3 at 30. Paragraphs B and D require, in part, "at least two" of "severe fatigue, fever, malaise, or involuntary weight loss." The ALJ acknowledged Crespo's fatigue, Doc. #21-3 at 34, but there is

no evidence she suffered any of the other symptoms during the relevant period. Crespo was regularly prescribed "fever" medication for pain but not for a fever, and APRN Latorre found no fever in May and June 2013 even when he prescribed such medications. Doc. #21-4 at 13, 17. Any mention of malaise in the record, all outside the relevant period, was negative. Doc. #21-4 at 131, 150; Doc. #21-5 at 12, 32; Doc. #21-10 at 13. Claimant alleges obesity, not involuntary weight loss. Thus, substantial evidence supports a non-finding under paragraphs B and D.

Absent any other argument that the impairments not found to be severe would have met or medically equaled the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1, I conclude that the analyses at Steps Two and Three were supported by substantial evidence and that there otherwise was no error here that requires remand, because the ALJ identified severe impairments at Step Two, considered Crespo's impairments "singly and in combination" in formulating the RFC, Doc. #21-1 at 35, and otherwise proceeded to evaluate Crespo's claim through the sequential evaluation process. *See Woodmancy v. Colvin*, 577 Fed. App'x. 72, 74 n.1 (2d Cir. 2014); *Stanton v. Astrue*, 370 Fed. App'x. 231, 233 n.1 (2d Cir. 2010).

### *The ALJ's evaluation of fibromyalgia, obesity, and chronic pain*

Crespo further alleges that the ALJ inadequately evaluated, alone and in combination with her other impairments, her fibromyalgia, Doc. #35-1 at 28-29; obesity, *id.* at 30-31; and chronic pain, *id.* at 32-33. For substantially the same reasons discussed above, I reject this claim.

Again, substantial evidence in the record reflects that Crespo's obesity was not a severe impairment. Crespo does not allege, and it is not clear from the record, why her obesity would preclude her from light work. Crespo's arguments as to her fibromyalgia and chronic pain primarily go to the subjectivity of pain, but an ALJ is not bound by a claimant's own pain assessments; he may use his discretion to assess its severity in light of all the evidence.

The ALJ acknowledged Crespo's pain, but found that her statements about its "intensity, persistence and limiting effects" inconsistent with the medical and other evidence in the record. Doc. #21-3 at 33-34. At her hearing, Crespo described having pain since 2000 or 2001, but for many years afterward "worked two jobs sometimes at the same time," would "go pick up [her] kids," and was "always working and running around with [her] kids." Doc. #21-3 at 57-58. She stated that her pain level "was always on an eight, nine, ten," *id.* at 58, which clearly contradicts the levels she reported to APRN Latorre during the relevant period. Despite this pain, Crespo "wasn't going to the doctor to figure out what was wrong with [her]" until it reached a certain point. *Id.* at 58. Crespo's testimony, combined with the varying pain levels reported to APRN Latorre during the relevant period, constitutes substantial evidence for the ALJ's determination as to her pain. *Cf. Reynolds v. Colvin*, 570 F. App'x 45, 49 (2d Cir. 2014) (failure to seek treatment despite alleged constant pain and physician's notes showing pain level variation over time were substantial evidence for not crediting claimant's debilitating pain testimony).

The ALJ also acknowledged Crespo's mental fatigue—the "fibro fog" alleged to be symptomatic of her fibromyalgia, Doc. #21-3 at 77-80—but again found her statements about its limiting effects inconsistent with the evidence in the record. Doc. #21-3 at 33-34. It was alleged during the hearing that Crespo began suffering from fatigue after her mother died in 2001 and that things are confusing to her some days and not others. *Id.* at 80. But as discussed above, despite this fatigue, Crespo testified that she worked multiple jobs and cared for her children for many years since then. Discussions of Crespo's memory in the record generally fall outside the relevant period, but APRN Calder noted in March 2011 that Crespo had "good" memory, Doc. #21-10 at 20, and Dr. Herbert Reiher, MD, found in November 2011 "[n]o evidence of impaired judgment or significant memory impairment," Doc. #21-11 at 172. The evidence adduced at the

14

hearing, and the observations of APRN Calder and Dr. Reiher, are substantial evidence for the ALJ's determination as to her fibromyalgia-related cognitive impairments. *Cf. Watson v. Berryhill*, 732 F. App'x 48, 53 (2d Cir. 2018) (treatment notes showing *inter alia* good memory and coherent thought processes were substantial evidence for only partially crediting claimant's debilitating fatigue testimony).

I conclude that the ALJ's evaluations of Crespo's alleged fibromyalgia, obesity, and chronic pain were supported by substantial evidence.

### *The ALJ's Step Five analysis*

Finally, Crespo claims that the ALJ's Step Five analysis was invalid because the ALJ relied on the testimony of a vocational witness who did not "identify the sources of her job incidence testimony." Doc. #35-1 at 34. The vocational expert provided job-numbers testimony while citing only the *Dictionary of Occupation Titles*, which merely defines types of jobs and does not speak to how many are available. *See Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 446 (2d Cir. 2012). The expert otherwise recited specific job numbers for three particular positions without identifying the source of these numbers (*e.g.*, "price marker . . . [n]ationally about 140,000 jobs"). Doc. #21-3 at 90. The ALJ afforded Crespo's representative an opportunity to examine the vocational expert, and the representative did so but did not challenge the vocational expert's testimony about job numbers or ask the vocational expert for the source of the job numbers. Doc. #21-3 at 92-94. Nor did the representative challenge the qualifications of the expert, who submitted an experience- and skills-laden resume. Doc. #21-9 at 57-58.

In light of these circumstances, Crespo's argument boils down to a claim that—even in the absence of any challenge or inquiry of the vocational expert about what sources the expert consulted—the substantial evidence standard is not satisfied as a matter of law if an ALJ relies

15

on job-numbers data from a vocational expert who does not state what source or sources she relied on to arrive at these numbers. I do not agree.

To begin with, I do not understand this specific issue to have been resolved by the Second Circuit. In *McIntyre v. Colvin,* 758 F.3d 146 (2d. Cir. 2014), the Second Circuit noted in passing that "a vocational expert is not required to identify with specificity the figures or sources supporting his conclusion, *at least where he identified the sources generally.*" *Id.* at 152 (emphasis added). This statement is at best equivocal support for the separate proposition that an ALJ must elicit from a vocational expert an identification of the sources upon which expert has relied even where claimant's representative has not done so.

Indeed, the Second Circuit in *McIntyre* went on to say that "[i]n the circumstances presented here, we conclude that the vocational expert was not required to articulate a more specific basis for his opinion, and the ALJ reasonably credited this testimony, which was given on the basis of the expert's professional experience and clinical judgment, and which was not undermined by any evidence in the record." *Ibid.* Crespo here does not question the experience and judgment of the vocational expert in this case, much less does she suggest any evidence that would undermine the expert's job-numbers data.[4]

More generally still, the substantial evidence standard does not foreclose an ALJ from relying on the expertise of a vocational expert and to do so without requiring the expert to lay a further foundation about the sources that the expert has consulted in order to arrive at the expert's job-number information. "A [vocational expert]'s recognized expertise provides the

---

[4] Also distinguishable is the Second Circuit's more recent decision in as *Lockwood v. Comm'r of Soc. Sec. Admin.*, 914 F.3d 87 (2d Cir. 2019), in which the court of appeals concluded that the ALJ erred by relying on a vocational expert's testimony where the testimony seemed to conflict with the *Dictionary of Occupational Titles*. Here, Crespo points to no such conflict of evidence but simply faults the ALJ for failing to elicit from the expert the source of the expert's job-number information.

16

necessary foundation for his or her testimony. Thus, no additional foundation is required."
*Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005).

The Supreme Court has recently ruled in a manner that further undermines Crespo's argument. In *Biestek v. Berryhill*, 139 S. Ct. 1148 (2019), the Supreme Court confronted the issue whether substantial evidence existed to support an ALJ's decision that relied on the testimony of a vocational expert about national job numbers in circumstances where the ALJ refused the claimant's request to require the expert to disclose the underlying data on which the expert relied. At the outset, the Supreme Court noted that, in contrast to federal court proceedings in which "an expert witness must produce all data she has considered in reaching her conclusions," there is "no similar requirement [that] applies in SSA hearings," because "Congress intended those proceedings to be informal and provided that the strict rules of evidence, applicable in the courtroom, are not to apply." *Id.* at 1154 (internal quotations omitted).

The Supreme Court went on to conclude that the substantial evidence test did not categorically foreclose an ALJ from relying on a vocational expert's opinion about the number of jobs available in the national economy even if the vocational expert declined upon request to disclose the data underlying the expert's testimony. *Id.* at 1155-57. The Supreme Court instead recognized the need for a "case-by-case" approach in which the substantial evidence threshold would not be met only "if the expert has no good reason to keep the data private and her testimony lacks other markers of reliability." *Id.* at 1157.

The Supreme Court's ruling in *Biestek* weighs against adopting the type of categorical rule that Crespo urges here. If the substantial evidence requirement does not categorically require a vocational expert to disclose her job-numbers data, even when specifically requested, neither

does it require a vocational expert to disclose the general source of her jobs-number data in the absence of any request. Adopting a case-by-case approach, I conclude that in the circumstances of this case, the vocational expert's failure to identify the sources of her job-numbers data does not dispel the existence of substantial evidence for the ALJ's conclusion that Crespo could perform a substantial number of jobs that existed in the national economy. *See Brault*, 683 F.3d at 449 (noting that "[a]s deferential as the 'substantial evidence' standard is, it is also extremely flexible" and that "[i]t gives federal courts the freedom to take a case-specific, comprehensive view of the administrative proceedings, weighing all the evidence to determine whether it was 'substantial'").[5]

Crespo also takes issue with some of the ALJ's hypotheticals posed to the vocational expert.[6] An ALJ may rely on a vocational expert's response to a hypothetical where the assumptions contained therein are supported by substantial evidence and accurately reflect the claimant's limitations. *See McIntyre*, 758 F.3d at 151. Crespo contests that the ALJ did not incorporate in his hypotheticals her moderate difficulties in concentration, persistence, and pace. Doc. #35-1 at 38-39. This is mere semantics. The ALJ included in his hypotheticals that Crespo could "sustain concentration, pace and persistence for two hour segments," Doc. #21-3 at 89, which is a moderate limitation, *see Cote v. Berryhill*, 2018 WL 4092068, at *26 (D. Conn. 2018).

Lastly, Crespo argues that the assumptions in one of the ALJ's hypotheticals—that Crespo can stand/walk for up to four hours a day, that only overhead reaching is restricted, and

---

[5] There are cases in the District of Connecticut that have remanded for failure of a vocational expert to identify the sources upon which the expert relied to furnish job-numbers data. *See, e.g*, *Martinez v. Berryhill*, 2019 WL 1199393, at *18-*19 (D. Conn. 2019); *Hernandez v. Berryhill*, 2018 WL 1532609, at *14-*15 (D. Conn. 2018). Because these decisions pre-date the Supreme Court's ruling in *Biestek v. Berryhill*, *supra*, I decline to rely on them.
[6] Confusingly, Crespo briefly mentions in this part of her motion briefing that the ALJ "does not appear to have given any weight to the opinion of any treating physician or clinician," then proceeds to quote long passages from caselaw without context. Doc. #35-1 at 36. At the hearing on both parties' motions, the Court asked Crespo's counsel whether Crespo was raising a violation of the treating physician rule. Counsel replied Crespo was not. Therefore, I do not address it.

18

that she can lift up to 20 pounds—were not supported by substantial evidence. Doc. #35-1 at 38. In fact, the ALJ did not ask the expert to assume Crespo could lift up to 20 pounds, but rather that she could do "light work." Doc. #21-3 at 89. "Light work involves lifting *no more than* 20 pounds at a time with frequent lifting or carrying of objects weighing *up to* 10 pounds," and a claimant need only have the ability to do "substantially" all these activities. 20 C.F.R. § 404.1567(b) (emphases added). I have already noted Crespo's testimony that she could lift 10-15 pounds in 2013, which light work encompasses. *See Johnson v. Colvin*, 669 F. App'x 44, 46 (2d Cir. 2016); *Bautista v. Berryhill*, 2019 WL 1594359, at *14 (D. Conn. 2019).

I have also noted that Crespo did not start using a walker until 2015, as well as the significant variations in her reported pain levels during the relevant period. Additionally, Dr. Reiher reported that she did not start using a cane until 2014. Doc. #21-11 at 169. And in June 2011, Crespo underwent a walking test that included walking two laps and climbing two flights of stairs; she reported only "[s]light" breathing difficulty afterwards, and her pulmonary physicians found she completed it "with best effort." Doc. #21-10 at 7-8. This is substantial evidence for the ALJ's finding as to her walking/standing ability during the relevant period. Lastly, although it is unclear where in the evidence the ALJ adduced a limitation on overhead reaching, it is also unclear that there was any limitation with reaching in general during the relevant period. A finding that is *more* restrictive than the evidence supports favors the claimant, *see Malloy v. Astrue*, 2010 WL 7865083, at *17 (D. Conn. 2010), and is not reversible error.

All in all, I conclude that the ALJ's Step Five analysis was supported by substantial evidence and that the ALJ otherwise did not make any reversible errors.

## CONCLUSION

For the foregoing reasons, the motion to reverse the decision of the Commissioner

19

(Doc. #31) is DENIED, and the motion to affirm the decision of the Commissioner (Doc. #35) is GRANTED. The Clerk of Court shall close this case.

Dated at New Haven this 25th day of September 2019.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge